Filed 8/30/21 In re L.G. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re L.G., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>J.T.,<br><br>       Defendant and Appellant. | A161341<br><br>(Sonoma County<br> Super. Ct. No. DEP6104) |

L.G., the minor, lives with her father, appellant J.T.[1]  In the summer of 2019, a dentist diagnosed L.G. with six cavities and three teeth in need of extraction.  Over the next year, L.G. saw multiple dentists but only had one tooth extracted and no cavities filled.  By the time of the jurisdictional hearing, L.G. had 11 cavities and at least one infected tooth in need of extraction—which placed her at risk of a more serious infection necessitating hospitalization.  As a result, the juvenile court declared L.G. a dependent

---

[1] Mother is estranged from the family and has had little or no contact with the father or L.G.  She did not participate in these dependency proceedings.

under Welfare and Institutions Code section 300, subdivision (b)(1),[2] placed her in father's custody, and gave the Sonoma County Human Services Department (Department) "exclusive authority" over L.G.'s dental care. Father challenges the sufficiency of the evidence to support the court's jurisdictional findings and dispositional order. We find the evidence sufficient to support the court's findings that L.G. was at substantial risk of serious physical harm or illness due to father's unwillingness or inability to provide adequate dental care and affirm.

## FACTS

### A. The Dependency Petition, the Detention of L.G., and Subsequent Hearings

After receiving a referral about L.G. in January 2020 when she was six years old, the Department met with L.K., father's then live-in girlfriend who helped take care of L.G. According to L.K., father "has always been against institutions including doctors, dentists, schools, government, etc." As a result, he refused to take L.G. to see a dentist until she was five. At that time, father allowed L.K. to take L.G. to a dentist, and in the summer of 2019, the dentist determined that L.G. had six cavities and three teeth in need of extraction. Rather than treat L.G.'s teeth, however, father "believed that the cavities would just get infected and fall out on their own." L.K. also informed the Department that L.G. recently had to have surgery to remove an earring from her ear lobe.

On January 26, 2020, L.G. woke with a swollen cheek so father and L.K. took her to a dentist. The dentist diagnosed L.G. with an abscessed tooth. Although the dentist wished to extract the tooth that day, L.G. was

---

[2] All further statutory references are to the Welfare & Institutions Code.

given antibiotics, and an appointment for the extraction was scheduled for January 29. On that day, however, father fed L.G. cereal for breakfast, and the extraction had to be rescheduled for February 3.

Father brought L.G. to the PDI Dental Surgery Center (PDI) on February 3, 2020 but became angry when PDI wanted to take x-rays and asked for consent to "any and all necessary treatment" after L.G. was "put under." Father then left with L.G. before she could have dental surgery. According to PDI, L.G. had three teeth in need of extraction and several in need of fillings and "could develop sepsis" if those teeth were not treated.

After father refused to talk to the Department about L.G.'s dental care, the Department scheduled an Imminent Risk Team Decision Making Meeting for February 13, 2020. The Department informed father about the meeting, but father did not attend.

On February 18, 2020, the Department filed a dependency petition, alleging that L.G. has suffered or faces a substantial risk of suffering serious physical harm or illness due to father's failure to provide proper dental care. Based on the "immediate risk for sepsis, a life threatening condition", the Department asked the juvenile court to detain L.G. in "protective custody . . . in order to ensure her safety." The Court did so but authorized her return to father after further investigation and 72 hours notice to the parties.

Three days later, the Department submitted an informational memo to the court. The memo stated that PDI would not treat L.G. until it obtained authorization from its Board due to "father's past behavior." As a result, the Department could only obtain a tentative date of March 17 for L.G.'s dental surgery. In response, father requested the immediate return of L.G.

3

At the February 27, 2020 hearing on father's request, the Department informed the court that L.G. had been returned to father the day before. Father reported that he had scheduled a dental appointment for L.G. with a different dentist for the next day. After expressing its displeasure with the Department over its misrepresentation of L.G.'s condition as emergent, the court ordered father to keep the dental appointment.

**B. The Jurisdictional Hearing**

On March 5, 2020, the Department submitted another informational memo to the juvenile court. According to the memo, the Department contacted father about the February 28 appointment. Father told the Department the dentist no longer "want[ed] to be involved" and would not return his calls or texts due to its actions. As a result, he had scheduled another appointment "in about 2 weeks" with a different dentist. The dental office that allegedly refused to see L.G., however, told the Department that father did not bring L.G. to the appointment and that the dentist "was [still] willing to see" her. The Department then filed an amended petition, adding this new information.

In its Jurisdiction Report, the Department wrote that PDI was willing to treat L.G. but had requested "a stay-away order for" father "as a pre-condition, due to father's eruptive anger as previously displayed in their office." The Department also reported that it was unable to meet with L.G. because father claimed she had the flu. Finally, the Report listed six allegations of neglect and emotional abuse against father from 2013 to 2020—and detailed father's criminal history—which included a 2013 felony conviction for burglary, a 2017 misdemeanor conviction for use of a controlled substance, and various older convictions for theft, possession of controlled substances, reckless driving, battery, and illegal possession of a firearm. The

4

Department recommended that the court sustain the petition and order random drug testing and a psychological evaluation of father.

In response to the Report, father provided a receipt for dental insurance. He also claimed he sent an email canceling the February 28 appointment because L.G. had a cold and asking to reschedule. When he did not hear back, father scheduled an appointment with another dentist for April.

At a March 2020 hearing, L.G.'s attorney reported that she was a "happy little girl." According to the attorney, L.G., who "was a little guarded," said that her mouth "hurt for a while" but it did not hurt "at that time." Father's attorney told the court that father only wanted to provide the name of L.G.'s newest dentist to the court. The court, however, ordered father to provide the dentist's information to the Department so it could check up on L.G.'s dental care. The court then continued the hearing to give father "the chance to get" L.G.'s "teeth done."

In May 2020, the Department reported that L.G. had not received any dental care yet because dental offices were closed due to the pandemic. It also reported that the social worker saw L.G.—who appeared to be "in good spirits and in no apparent distress"—in April but that father screamed at the social worker "saying that he was done with her." L.G.'s attorney was able to speak with L.G. but only in father's presence. The court expressed confusion over why L.G. had not received any treatment: "Here's what I don't understand: How we went from this child might die four months ago to now she's still doesn't have her dental services, when I know that dentists are doing emergency services. And at some point, this was an emergency situation." The court then set a jurisdictional hearing for June 19.

5

On June 12, 2020, the Department submitted an Addendum Report—which attached a letter from Dr. Tanvi Shah of PDI. In the letter, Dr. Shah wrote that L.G. came to PDI for treatment on February 3 and "revealed that she was waking up at night repeatedly with pain and just wanted the pain to go away." Dr. Shah determined that L.G. needed "at least three extractions, and several other fillings." Father, however, was "rude and disruptive" and refused to consent to treatment. According to Dr. Shah, "[i]t is in" L.G.'s "best interest to have her teeth worked on ASAP" because she suffers from "unnecessary discomfort and swelling," and because her teeth, if left untreated, could "place her in the hospital for dental abscess/cellulitis" and "affect her permanent teeth and other vital structures." In Dr. Shah's "professional opinion," delaying treatment "would have adverse effects on" L.G.'s "dental and medical health."

At the June 19, 2020 hearing, father presented an "itemized treatment plan" for L.G. In response, the Department asked for a continuance so it could contact Dr. Dana Yee, the dentist who prepared the plan. Father moved to dismiss the petition, but the court refused until the "dental work is done" and continued the hearing.

Five days later, the Department reported that Dr. Yee was reluctant to provide any information. Father moved to dismiss the petition. The court refused and suggested that father sign a release authorizing Dr. Yee to provide information to the Department.

Father, however, never signed a release. Nonetheless, the Department was able to subpoena Dr. Yee and learned that L.G. had "an emergency procedure on an infected tooth on July 13." Father moved to dismiss the petition based on Dr. Yee's statement that L.G. "was not experiencing dental pain." The court refused because father had "not followed through to the

6

extent that" he "should" and had "tried to mislead the Court" and his attorney. When the court stated that it was "considering taking custody back," the social worker responded that father appeared to be "starting to follow through" and that it was not in L.G.'s "best interest at this time to detain her." The court then set a jurisdictional hearing for August.

At the jurisdictional hearing, the Department introduced into evidence the social worker reports, the call service logs, and a letter from Dr. Yee dated August 4, 2020. In the letter, Dr. Yee stated that she saw L.G. on July 28 and discovered "11 teeth with cavities." Dr. Yee provided L.G. with a "comprehensive exam, radiographs, dental cleaning with fluoride, prescription for antibiotics given and silver diamine fluoride application to appropriate teeth with dental caries." She further stated that a follow-up appointment for "extraction of an infected tooth" had been scheduled for August 10.

Kara Jacobs, a social worker, testified that L.G., who was now seven, had six cavities in August 2019. That number had increased to 11 by the time Dr. Yee saw L.G. roughly one year later. Jacobs also testified that she transferred L.G.'s case to Melissa McKinney, another social worker, because father refused to allow Jacobs to speak to L.G. and spoke to her "in an elevated voice" at their last meeting. According to Jacobs, the Department had difficulty getting "cooperation from father." She had not, however, attempted to contact father by phone since mid-April, and apologized to father for failing to be more proactive from mid-March to mid-April. McKinney also had difficulty reaching father and was unable to see L.G. but was able to speak with father several times.

Jacobs further testified that she spoke with a nurse at PDI on February 24, 2020 who told her that L.G.'s condition was not life-threatening if she

7

took the prescribed antibiotics. According to Jacobs, L.G. seemed happy and normal when she saw her in April and that a police officer who saw L.G. in June described her as "happy and healthy". Jacobs also confirmed that dental offices were closed in May 2020 but stated that dentists could have seen L.G. "[u]p until mid-March."

Father testified that he knew that L.G. had six cavities in August 2019. He claimed he scheduled an appointment with PDI "as soon as possible" in January 2020. Father, however, was concerned that PDI might do unnecessary work and decided at the February 3 appointment to get a "second opinion" as suggested by PDI. That same day, father called Denti-Cal for options for a second opinion and learned they were limited. He then remembered a dentist, Dr. Gil Rodriguez, who had worked on his teeth in the past and scheduled an appointment with Dr. Rodriguez for February 28.

According to father, he canceled that appointment because L.G. was sick and sent an email asking to reschedule. He also claimed he called and texted Dr. Rodriguez but never heard back. Father then claimed he scheduled an appointment with Bright Now Dental in March. At that appointment Bright Now Dental identified cavities "that needed to be addressed" and "one extraction that needed to happen" and created a treatment plan. Father scheduled a follow-up appointment but the pandemic struck and the dental office shut down. Although father eventually rescheduled the appointment for June 4, Bright Now Dental refused to treat L.G. at that time because it was not an emergency and because of HVAC issues.

Father then testified that he scheduled an appointment with Dr. Yee for June 17, 2020. On July 13, L.G. had a tooth extracted. L.G. then had another appointment with Dr. Yee on July 28—during which Dr. Yee treated

8

her teeth with silver diamine fluoride. According to father, L.G. had another appointment with Dr. Yee for an extraction on August 19—which he intended to keep. Finally, father explained that Dr. Yee was unable to do any fillings because of HVAC issues.

As to his failure to obtain treatment for L.G.'s teeth earlier, Father testified that he deferred to the dentists and that the pandemic made it difficult to schedule appointments. He claimed there was no need to "immediately" treat L.G. "to prevent any serious harm" because he had "never once personally had a complaint from her about her teeth . . . [¶] . . . [¶] . . . since she was alive." He also claimed he never "noticed anything with her chewing or favoring anything." Finally, father claimed no dentist ever "expressed any kind of concern of any harm or danger that she might be in, in any way, shape or form." In particular, father denied that PDI mentioned any risks to L.G.'s health at the February 3 appointment.

Father also denied being "rude and disruptive" at the February 3 appointment or uncooperative with the Department. He claimed he never refused to allow the Department to see L.G and had been responsive to every request made by the Department. He, however, admitted that he refused to sign any releases because he felt "violated" by the Department.

The juvenile court sustained the petition, citing, among other things, father's "longstanding failure to cooperate with the" Department.

## C. The Disposition

On August 28, 2020, the Department filed a Disposition Report, recommending that the court declare L.G. a dependent and order family maintenance services. In support, the Department cited L.G.'s 11 cavities, including two abscessed teeth, and the serious health consequences to L.G.,

9

including "pain, difficulty in eating, malformation of her adult teeth" and the possibility of "death from sepsis," if these teeth remain untreated. On March 2, L.G. told the social worker that father told her not to " 'talk to anyone unless he is there.' " At the social worker's next meeting with L.G. in April, father "was very angry" and would not allow the social worker to speak with L.G. This was the last time the Department saw L.G. despite multiple efforts to schedule another meeting.

As to L.G.'s dental appointment on August 19, 2020, the Department reported that Dr. Yee was unable to treat L.G. because she was screaming and blocking her mouth with her hands despite the use of nitrous oxide. Because Dr. Yee could not sedate L.G. any further, she referred L.G. "to UCSF and Oakland Children's Hospital." Although the Department did not blame father for this latest failure to treat L.G.'s teeth, it stressed the need for father to cooperate with the Department to ensure that L.G. received the dental care she needed. Finally, the Department noted that father was "incredulous" about the court's ruling at the jurisdictional hearing because he had "done everything" he had been asked to do.

At the dispositional hearing, father testified that he took L.G. for a dental appointment in Oakland on September 2, 2020. Father claimed he did not schedule the appointment himself because the court "stripped" him of his ability to do so. At the appointment, he advocated for the use of nitrous oxide because it involved the "least risk" but recognized that nitrous oxide may not be enough. He, however, expressed concern about the use of general anesthesia. According to father, no treatment plan was made at that time, and another appointment was scheduled for September 25. Father also testified that he never prevented the Department from seeing L.G.

10

Noreen Mendoza, a social worker, testified that she made many efforts to "engage with" father after she was assigned the case in August. When her offer to include father in the scheduling of another dental appointment was ignored, she scheduled the September 2 appointment herself and provided father with the information.

After observing that father's frustration was understandable after L.G. had been erroneously removed from his custody at the detention hearing, the juvenile court ordered family maintenance services because L.G. still had not received adequate dental care over "seven months" later. The court expressed "zero confidence" that father, "if left to his own devices," would get L.G. the dental care that she needed. The court also noted the worsening condition of L.G.'s teeth and father's cavalier attitude toward her dental health. Although father appeared more cooperative, the court stated it was "not enough" and gave the Department "exclusive authority to make all decisions regarding" L.G.'s "dental care."

## DISCUSSION

### A. Motion to Augment the Record

In its motion to augment the record/request for judicial notice (motion), the Department asks the Court to consider the following postjudgment evidence: (1) supplemental petition filed pursuant to section 387; (2) minute order noting that the supplemental petition had been served; and (3) minute order sustaining the supplemental petition. We deferred ruling on the motion pending our determination of the merits of the appeal, and we now deny it.

"Consideration of postjudgment evidence in dependency appeals violates generally applicable rules of appellate procedure as well as the specific statutes that govern termination of parental rights, and is contrary to

11

the strong interest in finality of juvenile dependency proceedings." (*In re N.S.* (2016) 245 Cal.App.4th 53, 58.) Although courts have recognized an exception to this general rule "when an event occurs that renders it impossible for the court to grant effective relief" (*id.* at p. 59), that exception does not apply here (see *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225 ["If the court was without jurisdiction to rule on the section 300 petition, it was also without jurisdiction to consider the section 387 petition"]). Because we may not consider the section 387 petition or the juvenile court's ruling on that petition in deciding this appeal, the motion is denied.

## B. The Jurisdictional Findings

Father contends there was insufficient evidence to support the juvenile court's jurisdictional findings under section 300, subdivision (b)(1) at the time of the hearing. We disagree.

" '[W]e review both the jurisdictional and dispositional orders for substantial evidence. [Citation.] In doing so, we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment. [Citation.] But substantial evidence "is not synonymous with any evidence." [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] . . . The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]" [Citation.]' " (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560 (*Joaquin C.*).) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

12

Under section 300, subdivision (b)(1), a child may be declared a dependent if the juvenile court finds by a preponderance of the evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the willful or negligent failure of the parent or guardian to provide the child with adequate . . . medical treatment." Specifically, the court must find: (1) "one or more of the statutorily-specified omissions in providing care for the child"—i.e., a failure to provide adequate medical care (*Joaquin C.*, *supra*, 15 Cal.App.5th at p. 561); " '(2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness' " (*ibid.*). "The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future.' " (*In re James R.* (2009) 176 Cal.App.4th 129, 135, abrogated in part on another ground by *In re R.T.* (2017) 3 Cal.5th 622 (*R.T.*).) The focus is " 'on the child rather than the parent.' " (*R.T.*, at p. 625.)

"Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection." (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.) Indeed, a "past failure [may be] predictive of the future." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.) However, " 'there must be some reason beyond mere speculation to believe' " that serious physical harm or illness will occur in the future. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394, italics omitted, abrogated on another ground by *R.T.*, *supra*, 3 Cal.4th at p. 622.)

In this case, there was ample evidence at the time of the jurisdictional hearing that the minor was at substantial risk of serious physical harm due to father's unwillingness or inability to provide adequate dental care. In the

13

summer of 2019, L.G. was diagnosed with six cavities and three teeth in need of extraction. Despite this diagnosis, father did not take L.G. to see a dentist again until late January 2020 and only did so because she had a swollen cheek. At that time, L.G. was in "tremendous pain" and had "at least" three teeth in need of extraction. Despite this, father cancelled at least two dental appointments and cycled through four dentists over the next seven months. As a result, L.G. only had one of her teeth extracted and no cavities filled before the jurisdictional hearing in August 2020. In the meantime, L.G. now had 11 cavities and at least one infected tooth in need of extraction. The infections in her teeth, if left untreated, "could potentially spread and place her in the hospital for dental abscess/cellulitis and in need of IV antibiotics." Considered altogether, these facts are more than sufficient to establish that L.G. faced a substantial risk of serious physical harm without adequate dental care and that father was unwilling or unable to provide that care.[3] (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1048 ["juvenile court adjudicating dependency jurisdiction must consider all the circumstances affecting the child, wherever they occur"].)

Nonetheless, father contends the jurisdictional findings should be reversed because there was no evidence that L.G. had ever suffered serious physical harm at the time of the hearing. But father ignores evidence that L.G. was in "tremendous pain" and could not open her mouth widely in February 2020. In any event, section 300, subdivision (b)(1) does not require an "immediate medical necessity." (*In re Eric B.* (1987) 189 Cal.App.3d 996,

---

[3] After the jurisdictional hearing, Dr. Yee was unable to treat L.G. because L.G. needed to be sedated and referred L.G. to another dental clinic. Father, however, refused to work with the Department to schedule an appointment with that clinic. As a result, the Department scheduled the appointment. Although father took L.G. to the appointment, he left without a treatment plan.

1003.)  Instead, a "reasonable apprehension" of future harm is sufficient. (*Ibid.*)  The letter from Dr. Shah—which stated that it was "imperative" for L.G. to have her decaying teeth extracted or treated with "pulpotomie/crowns"—is more than sufficient to establish such a reasonable apprehension.

Father also argues that he provided L.G. with adequate dental care. But this argument is refuted by the simple fact that L.G.'s cavities and infected teeth were left largely untreated for almost one year after the initial diagnosis and almost six months after the filing of the dependency petition. Indeed, the condition of L.G.'s teeth actually worsened during that time period as evidenced by the almost doubling of her teeth with cavities. Although the pandemic did cause some delay, it does not explain why L.G. failed to get any treatment during the eight months before the pandemic struck or why her treatment was delayed after father was able to schedule dental appointments again in June 2020.  Although father cites a litany of excuses for the delay, the juvenile court did not find those excuses credible, and we may not reweigh the evidence on appeal.  (*Joaquin C.*, *supra*, 15 Cal.App.5th at p. 560.)

Finally, father's claim that he was ready, willing, and able to provide L.G. with the dental care she needed at the time of the jurisdictional hearing is belied by the evidence in the record.  According to his ex-girlfriend, father distrusted medical professionals, did not allow L.G. to see a dentist until she was five, and believed that L.G.'s infected teeth would simply fall out on their own.  Consistent with this cavalier attitude toward L.G.'s dental health, father downplayed the condition of L.G.'s teeth at the jurisdictional hearing. Indeed, he testified that L.G. never complained about any pain, that he never saw any sign that L.G.'s teeth were bothering her, and that no dentist had

15

ever expressed any concern about L.G.'s health.  Evidence of father's misleading statements to the Department and the court and his refusal to cooperate with the Department bolsters the conclusion that L.G. would not receive adequate dental care absent court intervention.  Thus, a reasonable trier of fact could conclude on this record that the "attitude" of father "posed a then-existing threat to" L.G.'s "well-being."  (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1170.)

Accordingly, we find substantial evidence to support the juvenile court's assumption of jurisdiction pursuant to section 300, subdivision (b)(1).

## DISPOSITION

The orders dated August 14, 2020, and September 15, 2020 are affirmed.

_____
Chou, J.*

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A161341


_____

    \* Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.